RECEIVED
NOV 15 2017
CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

UNITED STATES DISTRICT COURT
District of Minnesota

| | |
|---|---|
| UNITED STATES OF AMERICA, | INFORMATION |
| Plaintiff, | 18 U.S.C. § 371 |
| v. | CR 17-297 PJS |
| MICHAEL JOHN UDO, | |
| Defendant. | |

THE ACTING UNITED STATES ATTORNEY CHARGES THAT:

## BACKGROUND

**The Food Stamp Program**

1. The United States Department of Agriculture ("USDA") is an agency of the United States.

2. The Food and Nutrition Service is an agency of the USDA that runs the federal Food Stamp Program. The Food Stamp Program is funded entirely by the USDA through the Food Nutrition Service.

3. The USDA established and implemented the Food Stamp Program in order to raise the level of nutrition of low-income households by helping qualifying families and individuals buy food at approved retail food stores.

4. In running the Food Stamp Program, the Food and Nutrition Service delegates certain administrative duties to appropriate state agencies. In Minnesota the Minnesota Department of Human Services determines food stamp eligibility and administers the distribution and redemption of food stamp benefits.

SCANNED
NOV 16 2017
U.S. DISTRICT COURT MPLS

5. As of October 1, 2008, the official name of the Food Stamp Program changed to the Supplemental Nutrition Assistance Program, but some of the forms and regulations still refer to the Food Stamp Program. In this Information, Food Stamp Program (or "FSP") and Supplemental Nutrition Assistance Program (or "SNAP") are used interchangeably.

6. In 1993, the USDA, through the Minnesota Department of Human Services, converted from a traditional paper food stamp coupon system to what is known as an Electronic Benefit Transfer (EBT) card system. Instead of receiving food stamp coupons, SNAP recipients were issued EBT cards that could be used at participating retailers. EBT cards are like debit cards, and in the case of SNAP, the EBT card is credited with the recipient's allocated benefit amount on a monthly basis. The recipients can redeem benefits at participating authorized retailers.

7. As with traditional food stamp coupons, SNAP recipients are allowed to exchange their benefits only for eligible food items at the time of purchase of the eligible food items, and only at stores that are authorized by the USDA to accept SNAP benefits. According to regulations issued by the Secretary of Agriculture, authorized stores are prohibited from accepting SNAP benefits in exchange for items such as alcoholic beverages, tobacco, hot foods, cell phone minutes, and non-food items. These regulations also prohibit the redemption of SNAP benefits for cash (i.e., "trafficking"), to pay down a credit account at a store or to pay for eligible food items in advance of receiving the food.

CASE 0:17-cr-00297-PJS   Document 1   Filed 11/15/17   Page 3 of 12

United States v. Michael John Udo

8. SNAP benefits are redeemed in a fashion similar to a debit card transaction, either by manually entering the account information or by swiping the EBT card through a Point of Sale (POS) device. The SNAP recipient then enters a personal identification number (PIN) on the machine's external PIN pad to complete the transaction. Once the SNAP recipient enters the PIN, the POS device communicates electronically with FIS, an administrator for the USDA that processes SNAP transactions, to confirm availability of funds and approves or rejects the transaction. Regardless of whether a transaction is approved or denied, the POS device records the EBT card account number, the date and time of the transaction, and the amount debited or attempted to be debited from the food stamp recipient's EBT card. The POS device then produces a two-copy receipt, one for the food stamp recipient and one for the merchant, both of which include a warning that says "DO NOT DISPENSE CASH." When using EBT in a lawful manner, each transaction is for the exact dollar amount of the SNAP-eligible food items; the retailer does not provide the recipient with change.

9. To become eligible to participate in SNAP, retailers in Minnesota are required to complete, sign and submit a Food Stamp Program Application for Stores, form FNS 252. This application includes a certification from the applicant stating that he or she has read and reviewed the program rules and regulations. If the Food and Nutrition Service authorizes the retailer, it sends an authorization packet to the retailer, which also discusses the requirements of the Food Stamp Program. The forms

in this packet tell the retailer that the only allowable use of EBT food stamp benefits is to purchase food.

10. Retailers approved by the USDA to participate in SNAP are issued a food stamp authorization number and are provided with a POS device, which debits SNAP recipients' accounts for the cash value of the items purchased. USDA then reimburses the retailer for the redemptions via an electronic transfer into a bank account designated by the retailer.

**The WIC Program**

11. The Food and Nutrition Service also runs the Special Supplemental Nutrition Assistance Program for Women, Infants and Children ("WIC"). WIC is funded entirely by the USDA through the Food Nutrition Service.

12. The USDA established and implemented WIC to provide special supplemental foods and nutrition education to pregnant, postpartum and breastfeeding women, infants, and children from families with inadequate income.

13. In running WIC, the Food and Nutrition Service delegates certain administrative duties to state agencies. In Minnesota, the Minnesota Department of Health ("MDH") administers and monitors the WIC program.

14. Local WIC agencies provide eligible women and children ("participants") with WIC vouchers that they can redeem for specific types of nutritious foods at approved retail stores and pharmacies, known as WIC vendors. Each voucher contains a unique identification number and lists on its face the amounts and types of food the participant is entitled to receive with that voucher. The foods

themselves are to provide specific nutrients needed by the participant to whom the voucher was issued. A voucher is valid for 30 days or less, and is to be used on or between the "First Day to Use" date and "Last Day to Use" date listed on its face. Participants are generally issued three months' worth of vouchers at a time.

15. When accepting a voucher, a WIC vendor's cashier must ensure the voucher is being used during the proper time frame and that the foods selected by the WIC customer are WIC-allowed and of the correct type and quantity listed on the voucher. The cashier then totals the cost of the item(s) purchased, enters that price on the voucher, instructs the WIC customer to sign the voucher, and ensures that the WIC customer's signature matches one of the authorized signatures on his or her WIC Identification Folder. The cashier then records the date the voucher is being used and provides a receipt to the WIC customer. The retailer uses a uniquely numbered stamp, a Minnesota WIC Vendor Stamp, issued to that retailer to make an imprint on the voucher.

16. A retailer's prices for WIC foods cannot exceed the maximum prices established by the WIC program.

17. The retailer deposits the voucher into its bank as it would a check. The retailer's bank then routes the voucher or an electronic image of the voucher through standard banking channels to the Minnesota WIC Program's voucher processor for review. Voucher processor staff ensures that the voucher complies with WIC Program requirements, including that it has been used within the valid time period specified on

the voucher, that it has been signed by the WIC customer, that the price is written on the voucher, and that it contains a legible imprint of the retailer's stamp.

18. If the voucher passes the review, the voucher processor authorizes payment of the voucher from the Minnesota WIC Program's account at Citizen's Alliance Bank. Citizen's Alliance Bank routes payment for vouchers to the retailer's bank through standard banking channels.

19. To become eligible to participate in WIC, retailers in Minnesota are required to complete, sign and submit a WIC application form. If the store meets program requirements, store personnel must receive training and the owner must execute a retail food vendor agreement. The retail food vendor agreement is a contract between the WIC Program and the vendor that, among other things, describes the terms of the vendor's participation in the program, including that the vendor must comply with all applicable federal and state regulations and outlines the penalties for failure to comply with program requirements. The WIC Program gives each WIC vendor a vendor stamp with a unique identification number. The vendor uses the stamp to imprint the number onto each voucher it accepts.

## THE DEFENDANT AND THE STORE

20. At all times relevant to this Information, **MICHAEL JOHN UDO** was the co-owner and operator of Udo's African Food Store, LLC ("Udo's Store"), a 1,100 square foot convenience store located at 1459 University Avenue West, St. Paul, Minnesota. **MICHAEL JOHN UDO** also worked as a store cashier in Udo's Store.

21. On August 17, 2010, **MICHAEL JOHN UDO** and his wife, the corporate officer of Udo's Store, signed and submitted the 252 Application to apply for the Udo's Store's participation in the SNAP program. In the 252 Application, **MICHAEL JOHN UDO** agreed that he and all the employees of UDO'S STORE would comply with the rules and regulations of SNAP. Specifically, he agreed: "I accept responsibility on behalf of the firm for violations of the Food Stamp Program regulations, including those committed by any of the firm's employees, paid or unpaid, new, full-time or part-time. These include violations such as, but not limited to: trading cash for food stamp benefits (i.e. trafficking); accepting food stamp benefits as payment for ineligible items; accepting food stamp benefits as payment on credit accounts or loans; knowingly accepting food stamp benefits from people not authorized to use them."

22. On September 17, 2010, Udo's Store was authorized by FNS to accept SNAP benefits.

23. **MICHAEL JOHN UDO** signed the initial WIC program application for UDO's STORE on April 27, 2011, and signed a reauthorization application on January 6, 2014. **MICHAEL JOHN UDO** also signed retail food vendor agreements for UDO's STORE in June 2011 and January 2014. These agreements state, in part, that the vendor shall not provide, in exchange for a voucher or cash-value voucher, any store credit, cash, non-food items or food items other than the WIC-allowed foods specified on the voucher or cash-value voucher. It also states, in part, that in addition

to any other sanctions described in the agreement, the vendor is liable to prosecution under applicable federal, state, or local laws.

24. At all times relevant to this Indictment, **A.S.U.** was a store cashier and the only known non-owner store employee of Udo's Store.

## COUNT 1
(Conspiracy to Commit Illegal Redemption of Food Stamps)

25. Beginning in or about at least October 2010, and continuing through approximately July 2015, in the State and District of Minnesota, the defendant,

## MICHAEL JOHN UDO,

knowingly and willfully conspired and agreed with **A.S.U.** and with other persons both known and unknown to the grand jury to commit offenses against the United States, that is:

a) to knowingly use food stamp benefits or an access device, namely an electronic benefit transfer (EBT) card, in a manner contrary to the Food Stamp Act (Title 7, USC § 2011, et seq.) and the regulations thereunder, to acquire food stamp benefits of a value of $100 or more, in violation of Title 7, United States Code, Section 2024(b); and

b) to steal, purloin and knowingly convert to their use and benefit, money of the United States Department of Agriculture, Food and Nutrition Services, of a value greater than $1,000, in violation of Title 18, United States Code, Section 641.

## PURPOSE OF THE CONSPIRACY

26. The purpose of the criminal agreement was to obtain money and property from the United States Department of Agriculture by means of materially false and fraudulent pretenses, representations and promises, which scheme is further described below.

## MANNER AND MEANS OF THE CONSPIRACY

27. It was part of the scheme that beginning at least in or about October 2010 and continuing until in or about July 2015, defendant, A.S.U., and others known and unknown to the United States Attorney used the point of sale device from Udo's Store to process fraudulent food stamp transactions, namely by accepting food stamp benefits in exchange for discounted amounts of cash, knowing that such exchanges were prohibited under the Food Stamp Program.

28. It was further part of the scheme that beginning at least in or about October 2012 and continuing until in or about June 2015, defendant, A.S.U., and others known and unknown to the grand jury processed fraudulent WIC transactions, namely by accepting WIC vouchers in exchange for discounted amounts of cash, knowing that such exchanges were prohibited under the WIC program.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

29. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the state and District of Minnesota:

a) On or about September 18, 2014, food stamp benefits were exchanged for cash at Udo's Store, to wit: **A.S.U.** caused an EBT card to be swiped for $100.00, and the cardholder received $50.00 in cash.

b) On or about November 6, 2014, food stamp benefits were exchanged for cash at Udo's Store, to wit: **MICHAEL JOHN UDO**, in the presence of **A.S.U.**, caused an EBT card to be swiped for $194.00, and the cardholder received $100.00 in cash.

c) On or about November 18, 2014, food stamp benefits were exchanged for cash at Udo's Store, to wit: **MICHAEL JOHN UDO** caused an EBT card to be swiped for $194.00, and the cardholder received $100.00 in cash. On or about the same date, a WIC voucher was exchanged for cash at Udo's Store, to wit: **MICHAEL JOHN UDO** accepted a WIC voucher with an approximate retail value of $205.00, and the voucher provider received $80.00 IN cash.

d) On or about December 23, 2014, food stamp benefits were exchanged for cash at Udo's Store, to wit: **MICHAEL JOHN UDO**, in the presence of

  **A.S.U.**, caused two EBT cards to each be swiped for $194.00, and the cardholder received $200.00 in cash.

e) On or about January 20, 2015, food stamp benefits were exchanged for cash at Udo's Store, to wit: **A.S.U.** caused an EBT card to be swiped for $194.00, and the cardholder received $97.00 in cash.

f) On or about January 26, 2015, food stamp benefits were exchanged for cash at Udo's Store, to wit: **MICHAEL JOHN UDO** caused an EBT card to be swiped for $194.00, and the cardholder received $100.00 in cash.

g) On or about March 12, 2015, food stamp benefits were exchanged for cash at Udo's Store, to wit: **MICHAEL JOHN UDO** caused an EBT card to be swiped for $388.00, and the cardholder received $200.00 in cash.

h) On or about April 16, 2015, food stamp benefits were exchanged for cash at Udo's Store, to wit: **MICHAEL JOHN UDO** caused an EBT card to be swiped for $194.00, and the cardholder received $100 in cash. On or about the same date, a WIC voucher was exchanged for cash at Udo's Store, to wit: **MICHAEL JOHN UDO** accepted four WIC vouchers with an approximate retail value of $278.84, and the voucher provider received in $125.00 cash.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

Count 1 of this Information is hereby realleged and incorporated as if fully set forth herein by reference, for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

As the result of the offenses alleged in Count 1 of this Information, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Sections 371.

If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

Respectfully submitted,

Dated: November 15, 2017

GREGORY G. BROOKER
Acting United States Attorney

BY: SARAH E. HUDLESTON
Assistant U.S. Attorney
Attorney ID Number 0351489